TS-5643                                                          1

EN EL TRIBUNAL SUPREMO DE PUERTO RICO

| | |
|---|---|
| In re:<br><br>    Armando E. González Maldonado | 2000 TSPR 192 |

Número del Caso: TS-5643

Fecha: 20/diciembre/2000

Oficina de Inspección de Notarías:

                              Lcda. Carmen H. Carlos
                              Directora

Abogado de la Parte Querellada:

                              Por Derecho Propio

Materia: Conducta Profesional

        Este documento constituye un documento oficial del Tribunal Supremo que está
        sujeto a los cambios y correcciones del proceso de compilación y publicación
        oficial de las decisiones del Tribunal. Su distribución electrónica se hace
        como un servicio público a la comunidad.

EN EL TRIBUNAL SUPREMO DE PUERTO RICO

In re

Armando E. González Maldonado         TS-5643

PER CURIAM

San Juan, Puerto Rico, a 20 de diciembre de 2000.

En el presente caso, reafirmamos nuestro rechazo hacia la indiferencia de algunos abogados para con el cumplimiento de la Ley Núm. 75 de 2 de julio de 1987, según enmendada, conocida como la Ley Notarial de Puerto Rico (en adelante Ley Notarial), 4 L.P.R.A. sec. 2001 *et seq.*, así como del Reglamento Notarial de Puerto Rico, según enmendado (en adelante Reglamento Notarial), 4 L.P.R.A. Ap. XXIV.

I

El Lcdo. Armando E. González Maldonado (en adelante el notario) fue admitido a la práctica de la abogacía el 31 de octubre de 1977 y a la de la

notaría el 29 de noviembre de 1977.

Según los informes de la Oficina de Inspección de Notarías (en adelante ODIN), desde el 1977 hasta el 1989, inclusive, los protocolos del notario fueron hallados correctos.[1] Sin embargo, los protocolos para los años subsiguientes demuestran serias deficiencias.

Al respecto, el 18 de noviembre de 1999, la ODIN le cursó un informe al Juez Presidente señor Andréu García, por conducto de la Secretaria de este Tribunal, del cual surgen los hechos reseñados a continuación.[2]

Durante el 1998, la Lcda. Marla D. Ríos Díaz (en adelante la Inspectora) le notificó al notario que el 1 de octubre de ese año acudiría a sus oficinas ya que tenía inspecciones pendientes desde el 1991 hasta el 1997, **para un total de 3,731 escrituras.**[3]

Tras varios intentos,[4] finalmente, el 16 de diciembre de 1998, se inició la inspección. Durante la misma, la Inspectora se percató que habían sido examinados, pero no aprobados, los tomos correspondientes para el año 1990 y tres (3) tomos correspondientes al año 1991. Al cotejar las deficiencias señaladas, la Inspectora advirtió que el querellado no había tomado acción sobre varias de ellas. No obstante, la Inspectora prosiguió con el exhaustivo examen de los protocolos.

---

[1] A través de sus años en la práctica, el notario solamente fue sancionado en tres (3) ocasiones, en 1989, 1993 y 1995, por no notificar unas protocolizaciones de poderes dentro del término legal prescrito.

[2] El informe de nueve (9) páginas contiene un anejo con un desglose de las deficiencias incurridas por el notario. Dicho anejo consta de **más de cien (100) páginas.**

[3] El notario tiene una práctica voluminosa debido a que se dedica a efectuar cierres para una casa hipotecaria.

[4] El 29 de septiembre de 1998 la Inspectora se comunicó con el notario con el propósito de confirmar la inspección. A lo cual, éste le señaló que se encontraría de viaje durante el mes de octubre. La Inspectora pospuso la inspección para el 3 de noviembre de ese año.

continúa...

[4] ...continuación
El 19 de octubre de 1998 el notario conversó telefónicamente con la Inspectora con la intención de suspender nuevamente el comienzo del examen de su obra notarial. La Inspectora accedió, pero le concedió un plazo final hasta el 24 de noviembre de 1998.

**El 8 de enero de 1999,** al comenzar con la inspección del **protocolo para el año 1993,** la Inspectora observó que el protocolo **no estaba encuadernado en su totalidad.**[5] Durante la inspección de dicho protocolo, culminó el proceso de encuadernación. El 27 de enero de 1999, luego de completar el examen de la obra notarial de 1993, la Inspectora señaló fecha para la reinspección.

El 2 de febrero de 1999 la Inspectora se personó a la oficina del notario para el examen del año 1994. **Sin embargo, los tomos para dicho año no estaban disponibles para inspección.** Por lo que, la Inspectora dio inicio al examen de los tomos no inspeccionados del año 1991. Aun, el 5 de febrero, fecha en que concluyó la inspección, los protocolos para los años del 1994 en adelante no estuvieron disponibles.

Debido a que durante la inspección la Inspectora sólo vio al notario en tres (3) ocasiones y a la urgencia de continuar con el examen de la obra notarial, la Inspectora le dejó mensaje con la secretaria para reanudar el examen el 23 de febrero. Sin embargo, el 22 de febrero, con el propósito de confirmar la inspección, la Inspectora se comunicó telefónicamente con la secretaria del notario. Ésta le informó que el notario se encontraba fuera de Puerto Rico y que dejó encerrados los protocolos en un lugar al cual no tenía acceso. Ese mismo día, la Inspectora sometió un informe a la Lcda. Carmen H. Carlos, Directora de la ODIN (en adelante la Directora).[6]

El 3 de marzo de 1999 la Directora le remitió al notario una comunicación escrita, la cual acompañó con el informe de la Inspectora de 22 de febrero de 1999, para que expresara su posición por escrito. Además, la Directora le concedió un plazo final hasta el 26 de marzo de 1999 para corregir las faltas señaladas y concluir la encuadernación de los protocolos.

El 19 de abril de 1999 el notario compareció e indicó que "[e]n todo momento el notario suscribiente ha tenido a disposición de la Inspectora el trabajo

---

[5] El protocolo consta de 1,194 escrituras.
[6] Según el notario, la Inspectora erró al concluir que no podía continuar con la inspección ya que él "estaba en Puerto Rico el 22 de febrero a las 5:00 de la tarde y listo para recibir a la [I]nspectora el 23 de febrero." *Réplica sobre Obra Notarial Incautada* presentada el 22 de febrero de 2000, pág. 2.

notarial para inspección."[7] También señaló que la Inspectora constató que los señalamientos para los años 1991, 1992 y 1993 habían sido corregidos sustancialmente. Por último, mencionó que la Inspectora y él establecieron un plan de trabajo, el cual incluía reuniones periódicas, para concluir el examen lo antes posible.

Así las cosas, la Inspectora separó el mes de septiembre de 1999 para proseguir con el examen de la obra notarial y comenzar la reinspección de los años 1991, 1992 y 1993. Al reiniciar la inspección, la Inspectora observó que subsistían las faltas señaladas. Por lo que, no aprobó ninguno de los protocolos para esos años.

Ante esta situación, la Inspectora continuó con el examen de los protocolos para los años 1994 y 1995. Sin embargo, para el 16 de septiembre de 1999, el protocolo del 1996 no estaba disponible para inspección. Por tal razón, le indicó al notario que reanudaría la inspección la semana siguiente.

El 22 de septiembre de 1999 la Inspectora acudió a la oficina del notario, pero la encontró cerrada. Luego, en su oficina, le indicaron que el notario había llamado el día anterior para informar que su secretaria se encontraba enferma. En vista de ello, ese mismo día, la Inspectora preparó otro informe para la Directora.

En dicho informe, la Inspectora expresó que al examinar el protocolo correspondiente al año 1989, encontró una nota, junto al sello de aprobación, que expresaba que tal aprobación estaba condicionada a la cancelación de sellos del 10% adicional en las hipotecas otorgadas.[8] Al indagar sobre el particular, el notario le señaló que no había cancelado tales sellos. **Por último, la Inspectora expresó su preocupación por el estado e integridad de la obra notarial del notario.**

---

[7] Exhibit V del *Informe de la Directora* de 15 de noviembre de 1999, presentado el 18 de noviembre, dirigido al Juez Presidente señor Andréu García.
[8] La Inspectora indicó que del informe de aprobación de 18 de noviembre de 1991 no surgía que la aprobación estuviese sujeta a esa condición. *Véase*, Exhibit I del *Informe de la Directora* de 15 de noviembre de 1999, pág. 2.

Posteriormente, para agravar la situación, el notario le informó a la Inspectora que su oficina había sido robada y que los ladrones se apropiaron de $90,000.00 en sellos de Rentas Internas.

II

A raíz de la actitud demostrada por el notario, la Directora preparó el mencionado informe dirigido al Juez Presidente. En el mismo, la Directora indicó que entre 1991 y 1993, las deficiencias arancelarias "ascendían a un total de $2,641.50 y junto a los años 1994 y 1995 alcanzaban la cantidad de $6,760.00."[9] Esto sin contar el sinnúmero de deficiencias notariales que evidencian el craso descuido y desconocimiento de la Ley Notarial, *supra*, así como la falta de diligencia. Entre estas faltas, se encuentran la falta de sello y rúbrica, la falta de sello en la nota de apertura, la falta de sello y firma en la nota de cierre, el otorgamiento de escrituras posteriores con fecha anterior a escrituras anteriores, el utilizar hijos de otorgantes como testigos instrumentales.[10]

Ante la sorprendente situación, la Directora nos recomendó: (1) la incautación parcial de los protocolos correspondientes a los años 1989 al 1998 y los correspondientes tomos de Registros de Testimonios, al amparo de la Regla 78 del Reglamento Notarial, *supra*;[11] y (2) requerirle al notario que mostrase causa por la cual no debía ser suspendido del ejercicio de la profesión sin más citarle ni oírle.

Por tal razón, el 10 de diciembre de 1999, ordenamos la incautación de los protocolos de los años 1989 al 1998 y los correspondientes tomos de

---

[9] *Informe de la Directora* de 15 de noviembre de 1999, pág. 3.

[10] Dicho informe sólo se refiere a la obra notarial, no incluye los registros de testimonios.

[11] Regla 78. Procedimiento extraordinario de inspección

El Inspector informará **de inmediato** al Director de la Oficina de Inspección de Notarías cualesquiera casos que presenten **circunstancias extraordinarias**, particularmente aquellos en que esté en **riesgo la integridad de un Protocolo**.

En tales casos, así como en aquellos en el [sic] la sec. 2104 de este título será seguido en lo posible el procedimiento ordinario de inspección establecido en la Regla [77] de este Apéndice, sujeto a lo que el Tribunal Supremo de Puerto Rico ordene en cada caso en particular. (Énfasis suplido.)

Registros de Testimonios; así también, le concedimos al notario veinte (20) días para que mostrase causa por la cual no debíamos suspenderlo del ejercicio de la abogacía y de la notaría.

Mediante escrito de 24 de enero de 2000, titulado *Contestación a Informe*,[12] el notario señaló que la última vez que recibió la visita de un Inspector de la ODIN fue en el 1992. Conforme al notario, durante esa visita, se revisó la obra notarial del querellado hasta el 1990 y, sólo quedaron por revisar las hipotecas otorgadas según lo dispuesto por el caso Wendell William Colón,[13] ya que no sabía si la norma establecida tenía carácter retroactivo o prospectivo.

El notario expresó que luego de transcurrir cinco (5) años, **para fines de 1998**, la ODIN comenzó nuevamente con la inspección de la obra notarial teniendo "disponible para su inspección **toda la obra notarial debidamente encuadernada hasta el 1994 y posteriormente el 1995.**" (Énfasis nuestro.)[14]

El notario puntualizó que la Inspectora le suministró copia de un informe preliminar de faltas sobre el cual trabajó y corrigió sustancialmente las faltas informadas.[15] De igual forma, expresó que durante el 1999 autorizó varias escrituras para corregir las faltas indicadas.[16]

---

[12] El 3 de enero de 2000 el notario compareció solicitando prórroga para cumplir con nuestra orden ya que no tenía copia del Informe de la Directora que dio base a nuestra resolución. El 18 de enero de 2000 le concedimos hasta el 24 de enero del mismo para cumplir con nuestra resolución. Además, le informamos que debía obtener copia del referido informe en la ODIN.

[13] Al parecer, el notario se refiere al caso *Director Of. Inspección Notarías v. Colón*, 131 D.P.R. 102 (1992).

[14] *Contestación a Informe* de 24 de enero de 2000, pág. 2.

[15] El notario indicó que tenía que combinar su trabajo regular con la solución de las faltas, a pesar de que las mismas eran de fácil arreglo. Por lo que, a su parecer, la

**continúa...**

[15] **...continuación**
inspección de la obra notarial debió realizarse de forma que se revisase un año, se sometiese el informe de faltas preliminares, se le diese un tiempo razonable al notario para corregir las faltas y se llevase a cabo una reinspección de dicho año, para así concluir la inspección año por año. La razón de ello es que la obra notarial de cinco (5) años, que no fue inspeccionada durante ese término, tiene que ser corregida en un tiempo corto.

[16] El notario aclaró que según preparaba cada escritura colocaba copia de la misma en la oficina donde la Inspectora llevaba a cabo su trabajo. Añadió que "[n]inguna de las correcciones efectuadas a la [sic] falta [sic] indicadas en el informe preliminar e incluidas en las escrituras antes mencionadas fueron eliminadas en el informe que da base al presente caso, porque no han sido

Así también, llamó la atención al hecho de que las faltas señaladas en el informe preliminar "son en su gran mayoría de carácter repetitivo y producto de la utilización de unos formularios de hipotecas, recomendados por las diferentes publicaciones notariales y que fueron utilizados <u>por todos los Notarios [sic] de la industria</u> durante los años objeto de la inspección de nuestra obra notarial." (Subrayado en el original.)[17]

Sobre la cantidad de $6,760.00, referente a las deficiencias en sellos de los años 1991 al 1995, explicó que la misma se debía a la diferencia entre cómo la Inspectora calcula la cantidad de sellos y el valor que le da al negocio jurídico llevado a cabo en cada escritura, y no a que se haya negado a adherir los sellos.[18]

Respecto a los testimonios, el notario señaló que el informe de la ODIN indicó que había 7,104 testimonios sin examinar; pero que, la Inspectora no informó que había examinado hasta el testimonio 6,795. Por lo cual, según el notario, sólo quedaban por verificar aproximadamente 3,400 testimonios, y a la fecha de 31 de diciembre de 1999 quedarían 3,703.[19]

Nuevamente, el notario mencionó el incidente en el cual su oficina estaba cerrada ya que su secretaria no había asistido por estar enferma, así como, el incidente del escalamiento a su oficina de donde sustrajeron $92,000.00 en sellos de Rentas Internas.

Por último, el notario informó que le era difícil la labor de concluir la corrección de las faltas indicadas y verificar los tomos de los años sin inspeccionar ya que la obra notarial está en la ODIN. Por lo que, solicitó que se le devolviese la obra notarial incautada para terminar la corrección de las faltas y preparar los tomos no inspeccionados para inspección; y, que se le

---

re-examinadas a pesar de estar disponibles." (Subrayado en el original.) *Contestación a Informe* de 24 de enero de 2000, págs. 4-5.

[17] *Contestación a Informe* de 24 de enero de 2000, pág. 4.
[18] El notario adquirió la cantidad de $6,760.00 en sellos. Conforme al escrito, la mayoría de los mismos fue adherida a las escrituras en presencia de la Inspectora; mientras que, los que no había pegado era porque le interesaba que la Inspectora estuviese presente cuando los adhiriese a las escrituras.

[19] Según el notario, cabe señalar que, durante el período que la Inspectora visitó la oficina, los Registros de Testimonios estuvieron disponibles para inspección.

concediese un término razonable para realizar la labor; o, en su alternativa, que se le permitiese acceso a la obra notarial incautada para llevar a cabo el trabajo inconcluso.

El 10 de febrero de 2000 la Directora sometió *Informe Parcial sobre Obra Notarial Incautada y Otros Extremos* indicando que la incautación de la obra notarial en específico se realizó el 3 de enero de 2000. Dicha incautación resultó un poco dificultosa ya que parte de los protocolos se encontraba en la oficina del notario y el restante de la obra –los protocolos correspondientes a los años 1997 y 1998– **se incautó en la residencia del notario**. El notario se quedó en poder del resto de los protocolos y de varios tomos de Registros de Testimonios.

A juicio de la Directora, el volumen de la obra incautada dificultó rendir un informe final con relación a cualesquiera otras violaciones notariales que no habían sido objeto de inspección debido a la falta de cooperación del notario. Sin embargo, la Inspectora llevó a cabo la reinspección de los años 1991 al 1995, para determinar cuáles deficiencias habían sido corregidas, y se percató que todavía subsistían varias de las deficiencias.[20]

La Directora también advirtió que la aprobación del protocolo correspondiente al año 1989 estaba sujeta a la cancelación del 10% adicional en las hipotecas otorgadas y que, según la reinspección, aún subsistía una deuda arancelaria de $65.00.

Sobre los protocolos de los años 1996 y 1997, conforme a las directrices, los Inspectores realizaron una inspección, limitada a detectar deficiencias estrictamente de naturaleza arancelaria. **La deficiencia en sellos de Rentas Internas totalizó la suma de $57,428.00.[21] Con relación al protocolo del año 1998, la Directora advirtió que no aparece adherido *sello de clase alguna en los instrumentos públicos autorizados durante ese año*.** Entre las deficiencias arancelarias señaladas en la obra notarial incautada que no había podido ser

---

[20] El Informe de Reinspección de la Inspectora, el cual consta de 47 páginas, refleja un sinnúmero de deficiencias sin corregir. Al final de dicho informe, la Inspectora hizo constar que para el protocolo del 1995 subsistían todas las deficiencias señaladas.

[21] La deficiencia para el protocolo del año 1996 es de $25,411.00 y para el 1997 es de $32,017.00.

objeto de inspección y las deficiencias señaladas durante el proceso de inspección, que hasta el momento del informe no habían sido subsanadas, **la deuda ascendía a un total de $61,363.50.**

Según el referido informe de la Directora, el notario no entregó las actas de subsanación que alegadamente corrigen varias de las deficiencias señaladas para los años 1992-1994, a pesar de así requerírselo la Inspectora. Ello dificultó el concluir la reinspección para tales años. Tampoco entregó los tomos de los protocolos de diversos años que no estuvieron disponibles al momento de la incautación, ni los tomos correspondientes de su Registro de Testimonios, a pesar de solicitárselo la ODIN y haberse comprometido a ello.

La Directora señaló que el notario continúa en el pleno ejercicio de la profesión y de sus funciones notariales. [22] Al mismo tiempo, expresó su preocupación de que la obra del notario consiste principalmente en cierres para una casa hipotecaria, práctica que genera un gran volumen de escrituras en su mayoría constitutivas de hipotecas, las cuales requieren acceso al Registro de la Propiedad para su validez. Por lo cual, al expedir copias certificadas, el notario expresó **falsamente** que en los originales constaban las **firmas e iniciales de los otorgantes y del notario, y los correspondientes sellos de Rentas Internas e impuesto notarial.**

El 22 de febrero de 2000 el notario presentó *Réplica sobre Obra Notarial Incautada* aduciendo que la obra notarial siempre estuvo disponible para ser inspeccionada, así como, que no tuvo una reunión final con la Inspectora para discutir las faltas. Además, alegó que no existían razones suficientes para seguir el procedimiento establecido por la Regla 78 del Reglamento Notarial, *supra*, y que la ODIN notificó el informe del 15 de noviembre de 1999 sin haberle dado oportunidad de objetar el mismo y sin darle la oportunidad de corregir las faltas.

Con relación a las faltas, el notario expresó que:

> la mayoría de las faltas señaladas son de naturaleza simple, como son las de no haber aplicado el sello notarial en una página, o la rúbrica notarial, o no haber firmado una nota de saca o no haber aclarado los medios supletorios para poder

---

[22] Los informes de actividad notarial presentados durante el pasado año reflejan que el notario autorizó alrededor de 506 instrumentos públicos.

identificar a los comparecientes, o acreditar las facultades del acreedor hipotecario o de su representante, según dichas reglamentaciones hipotecarias aprobadas en esa fecha. Estos señalamientos de faltas fueron corregidos, pero no han sido objetos [sic] de re-inspección [sic]. **Estos señalamientos de faltas de por sí no son razones suficientes para recurrir a este Honorable Tribunal para que discipline a un Notario [sic].** Por lo menos [,] esa había sido la práctica hasta que se había realizado nuestro [sic] última inspección. (Énfasis nuestro.) *Réplica sobre Obra Notarial Incautada* de 21 de febrero de 2000, presentada el 22 de febrero de 2000, pág. 3.

El notario justificó el no haber adherido los sellos "simultaneamente [sic] con el otorgamiento de las escrituras." *Íd.*, pág. 6. Adujo que anteriormente habían desaparecido algunos de los sellos adheridos a las escrituras, de lo cual "[n]o pod[ía] responsabilizar a los encuadernadores ni a ninguna otra persona...." *Íd.*

Por otra parte, el notario manifestó que la Directora permitió que el encuadernador terminase la encuadernación del protocolo de 1997 y comenzase la del 1998.[23] Mediante escrito de 24 de febrero de 2000, presentado el 25 de febrero, el notario señaló que coordinó con la Directora los trabajos para corregir las faltas pendientes. El mismo 24 de febrero la Directora le dio acceso al notario a los protocolos. A lo que, el notario inmediatamente empezó a adherir los sellos de Rentas Internas y Notariales.

El 19 de mayo de 2000 la Directora presentó el *Informe Final sobre Estado de Obra Notarial Incautada*.[24] En dicho informe, la Directora aclaró que el mismo complementa el informe parcial rendido el 8 de febrero de 2000 y que no refleja las correcciones realizadas por el notario.[25]

Respecto al protocolo del 1998, la Directora señaló el sinnúmero de faltas que contiene el mismo, las cuales disfrutan de variedad.[26] No obstante, el

---

[23] Los protocolos se encuentran en la ODIN.

[24] Conforme a este informe, la obra notarial objeto de inspección contiene 7,306 instrumentos públicos. Véase, *Informe Final sobre Estado de Obra Notarial Incautada* de 19 de mayo de 2000, pág. 1.

[25] El informe parcial no comprendía el resultado de la inspección de los protocolos de 1990 y 1998. Dicho informe parcial incluyó el estado de la reinspección de protocolos de 1991 al 1995.

[26] A continuación, diversos ejemplos de las faltas cometidas: (1) nota de saca no indica a nombre de quién se expidió la copia certificada; (2) escritura carece de las iniciales del representante de la compañía hipotecaria; (3) espacios en blanco antes de la firma; (4) no se acompaña declaratoria de herederos, a pesar de expresar que sí se hace; (5) se indica que comparece una

cúmulo total de deficiencias arancelarias es de $78,880.50, en sellos de Rentas Internas, y de $972.00, en sellos Notariales.

Ante la gran cantidad de faltas cometidas, en particular aquellas relacionadas con la falta de firma y/o iniciales,[27] la Directora expresó su preocupación en cuanto al efecto jurídico con relación a la posible nulidad o anulabilidad de los documentos públicos. Tocante a este punto, la Directora sostuvo la necesidad de que determinemos la aplicación del proceso de subsanación de deficiencias de esta índole.

El 30 de mayo de 2000 el notario presentó un escrito señalando, en esencia, que había corregido la gran mayoría de las faltas señaladas, incluyendo el adherir los sellos de Rentas Internas y aranceles notariales a las escrituras otorgadas en el 1998, para lo cual tuvo que incurrir en deudas considerables. También indicó que la falta relacionada con la ausencia de mención de medios supletorios se debía a enmiendas efectuadas en los formularios de constitución de hipotecas.

Además, recalcó el hecho de que la falta de firma del representante del acreedor hipotecario se debe a la dificultad en la obtención de la firma del mismo.[28] Ante lo cual, señaló que, tan pronto concluyese la revisión y corrección de todas las faltas, llevaría al representante del acreedor hipotecario a la ODIN para corregir las escrituras que adolecen de la falta de firma de éste. Por lo cual, solicitó que en el caso de determinar que la

---

persona, como representante de la casa hipotecaria, y aparece otro representante firmando; y, (6) falta de firma del notario.

[27] El número de escrituras con dichas faltas: (1) 1990 – 32 escrituras; (2) 1991 – 2 escrituras; (3) 1992 – 24 escrituras; (4) 1993 – 19 escrituras; (5) 1994 – 7 escrituras; (6) 1995 – 20 escrituras; (7) 1996 – 10 escrituras; (8) 1997 – 25 escrituras; y (9) 1998 – 162 escrituras. Véase, *Informe Final sobre Estado de Obra Notarial Incautada* de 19 de mayo de 2000, pág. 3.
[28] Sobre el particular, expuso lo siguiente:

> [l]a operación de obtener la firma del representante del acreedor hipotecario se convierte en "la caza del ratón por el gato", hay que buscar a esta persona por todas las partes de las oficinas del acreedor hipotecario, hasta que finalmente uno lo encuentra y entonces comienza un proceso "tengo mucho trabajo", "podrías venir mas [sic] tarde, estoy reunido", "no tengo tiempo ahora", "voy a almorzar", "tengo cosas mas [sic] importantes que esto", "deja las escrituras ahi [sic], que las firmo cuando yo pueda", etc. Escrito de 30 de mayo de 2000, págs. 4-5.

posterior obtención de la firma no subsana el defecto dicha norma tenga efecto prospectivo.

Luego de proveer el trasfondo de la situación ante nos, estamos en posición de resolver.

III

De entrada, es menester recordar varios principios básicos del Derecho notarial.

El notario es el conocedor "del Derecho que ejerce una función pública" al "**dar fe y autenticidad** conforme a las leyes de los negocios jurídicos y demás actos y hechos extrajudiciales que ante él se realicen, sin perjuicio de lo dispuesto en las leyes especiales." (Énfasis nuestro.) Art. 2 de la Ley Notarial, 4 L.P.R.A. sec. 2002.

El notario es quien recibe e interpreta la voluntad de los otorgantes, le da forma legal, redacta los documentos notariales a tal fin y le confiere autoridad a los mismos. *Íd.* En el cumplimiento de "dicha función el notario puertorriqueño representa la fe pública y la ley para todas las partes." *In re Colón Muñoz*, 131 D.P.R. 121, 127 (1992).[29] Es decir, el notario es guardián de la fe pública. *In re Jiménez Brackel*, res. el 11 de mayo de 1999, 99 TSPR 73, 148 D.P.R. ___ (1999), 99 JTS 79, pág. 1015.[30]

Como es sabido, al autorizar "un documento [el notario] presuntamente da fe y 'asegura que ese documento cumple con todas las formalidades de ley, formal y sustantivamente, que el documento es legal y verdadero, y que se trata de una transacción válida y legítima.'" *In re Rivera Alvelo y Ortiz Velázquez*, 132 D.P.R. 840, 863 (1993), citando a *In re Feliciano Ruiz,* 117 D.P.R. 269, 275 (1986).[31] Por lo que, en ese momento, el documento queda cobijado de la fe pública y de la presunción *iuris tantum* de que los actos que ve y oye –*vidit*

---

[29] La Exposición de Motivos de la Ley Notarial, *supra*, advierte que "[e]n esa función el notario puertorriqueño no es abogado de ninguno de los otorgantes, no representa a cliente alguno, **representa a la fe pública**, representa la ley para todas partes." (Énfasis nuestro.) Leyes de Puerto Rico de 1987, pág. 262.

[30] Véase también, *In re Vera Vélez*, res. el 5 de abril de 1999, 99 TSPR 46, 148 D.P.R. ___ (1999), 99 JTS 51, pág. 833; *In re Martínez Ramírez*, res. el 27 de enero de 1997, 142 D.P.R. ___ (1997), 97 JTS 11, pág. 534 n. 5; *In re Vargas Hernández*, 135 D.P.R. 603, 607 (1994).

[31] Véase también, *In re Vera Vélez*, supra; *In re Martínez Ramírez*, supra.

*et audit*– y que lo consignado por el notario es legal y verdadero. *In re Capestany Rodríguez*, res. el 30 de junio de 1999, 99 TSPR 109, 148 D.P.R. ___ (1999), 99 JTS 113, pág. 1339; *In re Colón Muñoz*, supra, pág. 150; *In re Roldán Figueroa*, 129 D.P.R. 718, 721 (1992).

Sobre el particular, el Art. 2 de la Ley Notarial, *supra*, dispone que **"[l]a fe pública al [sic] notario es plena respecto** a los hechos que, en el ejercicio de su función personalmente ejecute o compruebe y también respecto **a la forma, lugar, día y hora del otorgamiento."** (Énfasis nuestro.)

Al respecto, es importante señalar que, en la ejecutoria de esta función, el notario está obligado a observar rigurosamente la Ley Notarial, *supra* –y su reglamento–, los Cánones de Ética Profesional, 4 L.P.R.A. Ap. IX, y el contrato entre las partes. De lo contrario, el notario se expone a las sanciones disciplinarias correspondientes.[32] *In re Vera Vélez*, supra.[33] Las cualidades de autenticidad y validez de un instrumento público están sujetas a que el notario observe escrupulosamente los requisitos y formalidades impuestos por la Ley Notarial, *supra*. *Cintrón Ramos v. Registrador*, res. el 13 de noviembre de 1997, 144 D.P.R. ___ (1997), 97 JTS 132, pág. 141; *Ramírez Lebrón v. Registrador*, 131 D.P.R. 76, 81 (1992); *Sucn. Santos v. Registrador*, 108 D.P.R. 831, 834 (1979).

Además, debido a la importancia dentro del tráfico jurídico de bienes, el notario tiene que ser en extremo cuidadoso, así como desplegar sumo esmero y celo en su desempeño profesional. *In re Capestany Rodríguez*, supra; *In re Vera Vélez, supra*; *In re Torres Olmeda, supra*. Esto último implica que el notario tiene que mantenerse al día y seguir las disposiciones legales que reglamentan esta profesión, así como la doctrina y jurisprudencia. *In re Torres Olmeda*, supra; *In re Feliciano Ruiz*, supra.

---

[32] Al incumplir alguno de éstos, el notario podría ser responsable tanto civil como criminalmente. Véase, *In re Vela Colón*, res. el 19 de diciembre de 1997, 144 D.P.R. ___ (1997), 98 JTS 13 (responsabilidad civil del notario); *Chévere v. Cátala*, 115 D.P.R. 432 (1984) (responsabilidad civil del notario); *In re Capestany Rodríguez*, supra (el no adherir los sellos podría constituir apropiación ilegal).

[33] Véase también, *P.A.C. v. E.L.A.*, res. el 25 de febrero de 2000, 2000 TSPR 29, 150 D.P.R. ___ (2000), 2000 JTS 33, pág. 690; *In re Capestany Rodríguez*,

Luego de exponer estos principios básicos de la fe pública notarial, corresponde analizar las deficiencias señaladas por la Inspectora y las actuaciones del notario respecto a las mismas.

IV

A.   *Disponibilidad de la obra notarial sujeta a inspección*

La Regla 77 –Procedimiento ordinario de inspección de Protocolos y Registros– del Reglamento Notarial, *supra*, le impone al Inspector el deber de notificar con antelación razonable la fecha de inicio de la inspección. Además, establece que no es necesario que el notario esté presente durante la inspección. No obstante, si se ha de ausentar, el notario tiene la obligación de proporcionar las "facilidades necesarias" para que la inspección se lleve a cabo sin interrupciones. *Íd*. En lo posible, la inspección se realizará día a día. *Íd*.

Esta regla, en su inciso (L), dispone que si la inspección no es concluida por razones atribuibles al notario, el Inspector presentará al Director de la ODIN un informe, el cual debe incluir: (1) un resumen de los hechos acaecidos y (2) copia de los señalamientos hasta el momento. 4 L.P.R.A. Ap. XXIV R.77(L). Este informe se le notificará al notario.

En el presente caso, a pesar de la notificación con suficiente tiempo de antelación, la Inspectora confrontó problemas con el notario para comenzar la inspección ya que el notario suspendió el inicio de la misma en dos ocasiones. Para complicar más la situación, luego de comenzada la inspección, el notario no tenía disponibles los protocolos objeto de la inspección.

A pesar de concederle varios días para tener disponibles los protocolos, al tratar de confirmar la fecha para reanudar el examen de la obra notarial, la Inspectora fue informada que el notario dejó los protocolos encerrados y que la secretaria no tenía acceso a los mismos.

No nos persuade el razonamiento del notario de que la Inspectora llegó a una conclusión incorrecta, al estimar que el notario no estaría presente, ante lo cual no tendría acceso a la obra notarial. El notario partió de la

---

supra, pág. 1338; *In re Torres Olmeda*, res. el 23 de abril de 1998, 98 TSPR 48, 145 D.P.R. ___ (1998), 98 JTS 60, pág. 960.

premisa que la Inspectora poseía un poder de clarividencia que le adelantase que él estaría al día siguiente, lo cual su secretaria –mano derecha del jefe- desconocía. Ante esta situación, la Inspectora actuó conforme a derecho al rendir el correspondiente informe.[34] Por lo cual, el notario incurrió en violación a la Ley Notarial, *supra*, al no facilitarle la labor de inspección a la Inspectora.

B.   *Deber de custodiar y no remover los protocolos*

La Ley Notarial, *supra*, taxativamente establece que "[l]os protocolos [le] pertenecen al Estado." Art. 48 de la Ley Notarial, 4 L.P.R.A. sec. 2072. En reiteradas ocasiones, hemos señalado que el notario es un mero custodio de los protocolos, encargado de guardarlos celosa y responsablemente para que no se pierdan y/o deterioren. *In re Sánchez Quijano*, res. el 7 de junio de 1999, 99 TSPR 88, 148 D.P.R. ___ (1999), 99 JTS 118, pág. 1377; *In re Capestany Rodríguez*, supra, pág. 1339; *In re Colón Muñoz*, supra, pág. 150. Si dichos protocolos sufren algún perjuicio debido a la falta de diligencia del notario, éste tiene la obligación de reponerlos o restaurarlos a sus expensas, sin excluir la posibilidad de la imposición de medidas disciplinarias. Art. 48 de la Ley Notarial, *supra*; *In re Antonio Ríos Acosta*, 128 D.P.R. 412 (1991).

Así también, el Art. 53 de la Ley Notarial, 4 L.P.R.A. sec. 2077, **terminantemente prohíbe** que el notario remueva los protocolos de la oficina –donde estén custodiados-, a menos que medie decreto judicial o autorización de la ODIN. *In re Sánchez Quijano*, supra.[35]

En la situación ante nos, al momento de la incautación, se encontró parte de la obra del notario en la residencia de éste, sin la correspondiente autorización de la ODIN o decreto judicial. De lo antes expresado, concluimos que el notario actuó en clara violación a la Ley Notarial*, supra*.

C.   *Deber de encuadernar los protocolos*

---

[34] Véase, nota al calce núm. 6, *ante*.
[35] Véase*, Regla 58 del Reglamento Notarial, *supra*.

El Art. 52 de la Ley Notarial, 4 L.P.R.A. sec. 2076, le impone a los notarios la obligación de tener los protocolos del año anterior encuadernados a más tardar para el último día de febrero del año corriente.[36]

En la situación de autos, según el propio notario, para fines de 1998 estaba "disponible para su inspección toda la obra notarial debidamente encuadernada hasta el 1994 y posteriormente el 1995."[37] Sin embargo, el 8 de enero de 1999, cuando la Inspectora comenzó el examen de la obra notarial del 1993, ésta no había sido encuadernada en su totalidad. Esto es casi cinco (5) años luego del término prescrito por la Ley Notarial, *supra*. Además, conforme al informe de la Directora de 8 de febrero de 2000, al momento de la incautación, los protocolos de 1997 y 1998 no estaban encuadernados.

Esta actuación obstinada del notario –de no tener los protocolos encuadernados a tiempo– demuestra su falta de diligencia, celo profesional y responsabilidad. Además, evidencia un abierto desafío al estricto cumplimiento de la Ley Notarial, *supra*, la cual lo expone a sanciones disciplinarias. *In re Colón Muñoz*, supra, págs. 164-165. Incluso, tomando en consideración la escasez y la disponibilidad de los encuadernadores, lo cual podría atenuar la violación, no hay razón que justifique tener los protocolos sin encuadernar por varios años.

D.    *Falta de mención del estado civil de los otorgantes*

Conforme al último informe de la Directora, muchas escrituras adolecían de faltas relacionadas con el estado civil de los otorgantes, característica inherente de una persona.[38] Entre éstas se encontraban, a saber: (1) la omisión del estado civil de algún otorgante; (2) la comparecencia de un otorgante casado y la falta del nombre del cónyuge; y (3) cónyuge no firma ni inicia los folios.

---

[36] La Ley 265 de 17 de agosto de 1999 enmendó el Art. 52 de la Ley Notarial, *supra*, extendiendo el término para encuadernar los protocolos hasta marzo.

Sin embargo, los hechos que nos ocupan ocurrieron antes de la aprobación de la misma. Por lo cual, la anterior ley es la de aplicación. No obstante, de cualquier forma en la presente situación, el notario tardó varios años en que le encuadernaran los protocolos.

[37] Véase, nota al calce núm. 14, *ante*.

[38] Véase, *In re Astacio Caraballo*, res. el 8 de diciembre de 1999, 2000 TSPR 11, 149 D.P.R. ___ (1999), 2000 JTS 16, pág. 531.

El expresar el estado civil de los otorgantes "es un requisito sustantivo que se impone en protección de los otorgantes." *In re Colón Muñoz*, supra, pág. 160. Esta formalidad tiene mucha trascendencia ya que está relacionada con la capacidad legal de los otorgantes para entrar en un negocio jurídico, la cual a su vez puede afectar la validez del negocio jurídico.[39] Dicho requisito está regulado por el Art. 15 de la Ley Notarial, 4 L.P.R.A. sec. 2033 (Supl. 1999), que reza de la siguiente forma:

> [l]a escritura pública, en adición al negocio jurídico que motiva su otorgamiento y sus antecedentes y a los hechos presenciados y consignados por el notario en la parte expositiva y dispositiva contendrá lo siguiente:
> .   .   .   .   .   .   .   .   .
> (d)   [e]l nombre y apellido o apellidos, según fuere el caso, la edad o mayoría, **estado civil**, profesión y vecindad de los otorgantes, su número de Seguro Social, de éstos tenerlo, nombre y circunstancias de los testigos, de haber alguno, según sus dichos. **En caso de que cualquiera de estos otorgantes fuera casado, y no sea necesaria la comparecencia del cónyuge, se expresará el nombre y apellido de éste aunque no comparezca al otorgamiento.** (Énfasis nuestro.)

El texto de este artículo es claro en imponerle al notario la obligación de expresar el estado civil de los otorgantes y de mencionar el nombre completo del cónyuge, incluso en las ocasiones en que no sea necesario que dicho cónyuge compareciese. La observancia de esta obligación es esencial "so pena de defecto de título." S. Torres Peralta, *El Derecho Notarial Puertorriqueño*, Ed. Especial 1995, San Juan, Publicaciones STP, Inc., 1995, pág. 8.12.

Inclusive, dicha inobservancia dificulta el acceso de los documentos otorgados al Registro de la Propiedad. El Art. 99.2 del Reglamento General para la Ejecución de la Ley Hipotecaria y del Registro de la Propiedad (en adelante el Reglamento Hipotecario), que trata sobre las circunstancias que se expresan en la primera inscripción, en su séptimo párrafo requiere que se mencionen los nombres y circunstancias personales de quien(es) proceda(n) inmediatamente el(los) bien(es) o derecho(s) a inscribirse, "con especificación, cuando se

---

[39] Una persona casada que otorga un negocio jurídico enajenando bienes gananciales sin que se exprese su estado civil –en el instrumento público– y sin que comparezca su cónyuge, no tiene la capacidad legal suficiente para darle validez jurídica al negocio acordado. Dicha actuación es *ultra vires*, y el negocio sólo surte efecto jurídico desde el momento en que el otro cónyuge lo ratifique. *Soto v. Rivera*, res. el 9 de diciembre de 1997, 144 D.P.R. ___ (1997), 97 JTS 145, págs. 367-368.

trate de personas casadas, de los nombres y apellidos de ambos cónyuges." 30 R.P.R. sec. 870.1092(2)(g).

El estado civil es un circunstancia esencial para que el Registrador de la Propiedad califique la capacidad de los otorgantes;[40] es decir, si el otorgante puede o no transmitir o enajenar el derecho objeto del negocio jurídico. Por ello, tal detalle debe constar en el documento a inscribir. *Royal Bank of Canada v. Registrador*, 104 D.P.R. 400, 403 (1975).[41] Véase, B. Camy Sánchez-Cañete, *Comentarios a la Legislación Hipotecaria*, 3ra. ed., Pamplona, Ed. Aranzadi, 1982, V. I, pág. 470.

También la ausencia de mención del estado civil de un comprador "al momento de hacer el pago al vendedor, priva al Registrador de un dato esencial de la inscripción como lo es la naturaleza ganancial o privativa del inmueble adquirido." *Royal Bank of Canada v. Registrador*, supra, pág. 401. De no expresar el estado civil de los otorgantes, "el asiento registral carece de certeza de cuál fuera el verdadero titular del inmueble comprado...." *Íd.*, pág. 403.

Si bien, al momento, no se ha levantado planteamiento alguno sobre dificultad alguna en la inscripción de instrumentos públicos autorizados por el notario, la omisión de expresar el estado civil de los otorgantes demuestra su craso desconocimiento de nuestro ordenamiento inmobiliario registral y de la Ley Notarial, *supra*.[42]

E.    *Falta de número de seguro social de otorgantes*

El Art. 15(d) de la Ley Notarial, *supra*, requiere que el notario exprese en el instrumento público, entre otras cosas, el número de seguro social de cada uno de los otorgantes. La Regla 25 del Reglamento Notarial, *supra*, dispone

---

[40] La calificación del Registrador "comprend[e] las formas extrínsecas de los documentos presentados, la capacidad de los otorgantes y la validez de los actos y contratos contenidos en tales documentos." Art. 64 de la Ley Hipotecaria, 30 L.P.R.A. sec. 2267. Véase, *Cintrón Ramos v. Registrador*, supra, pág. 142; *Ramírez Lebrón v. Registrador*, 131 D.P.R. 76, 82-83 (1992).

[41] Este caso fue resuelto bajo la anterior Ley Hipotecaria, 30 L.P.R.A. ant. sec. 1 *et seq*.

[42] Un principio fundamental del derecho inmobiliario registral es que sólo logren acceso al Registro de la Propiedad "los títulos válidos y perfectos." *Cintrón Ramos v. Registrador*, supra, pág. 141. Véase también, *Rodríguez Morales v. Registrador*, res. el 29 de enero de 1997, 142 D.P.R. ___ (1997), 97 JTS 12, pág. 543; *Ramírez Lebrón v. Registrador*, supra, pág. 81; *Kogan v. Registrador*,

que no es obligatorio mencionar el número de seguro social del cónyuge no compareciente cuando tal comparecencia no es necesaria.

Cuando el compareciente interviene como agente del otorgante, el notario "hará constar el número de seguro social del otorgante representado." S. Torres Peralta, *op. cit.*, pág. 8.15. En dicha situación, el notario no tiene que incluir "el número de seguro social de quien comparece en carácter representativo...." Regla 25 del Reglamento Notarial, *supra*. En cambio, cuando el otorgante es una persona jurídica, el notario debe incluir el número de seguro social patronal de la misma, si lo tiene. *Íd.*

Si un otorgante se rehúsa a informar su número de seguro social o no tiene un número de seguro social asignado, el notario debe hacer constar tal circunstancia en la escritura pública. S. Torres Peralta, *op. cit.*, pág. 8.16.

En el caso ante nos, el notario omitió expresar el número de seguro social de los otorgantes en varias escrituras. Sorprendentemente, dentro de esas ocasiones, el número que el notario olvidó incluir fue el número de seguro social patronal de la casa de financiamientos hipotecarios para la cual, ordinariamente, efectuaba los cierres. Ante esta situación, el notario no ha mencionado motivo alguno que justificase el violar dicho principio notarial, si alguno existiese. Situaciones como ésta demuestran el craso menosprecio para con el cumplimiento de la Ley Notarial, *supra*, y su Reglamento, *supra*, y la cicatería de algunos abogados, los cuales aparentan no recordar que la notaría es una profesión que debe ejercerse con sumo celo y cuidado.[43]

F.   *Falta de acreditación de las facultades de un representante-compareciente*

Antes de entrar a discutir la falta señalada, es necesario reiterar que todo notario tiene la obligación de asegurarse de la capacidad de las partes, de manera que se observen todos los requisitos del contrato. *In re Feliciano Ruiz*, supra, pág. 276.

---

125 D.P.R. 636, 674 (1990); *U.S.I. Properties, Inc. v. Registrador*, supra, pág. 465.

[43] "La notaría es faena de tiempo y paciente integración de todos los elementos documentales, que sufre en su calidad con la festinación y la atracción de los atrechos fáciles." *Empire Life Ins. Co. v. Registrador*, 105 D.P.R. 136, 139 (1976) citado en *In re Del Río Rivera y Otero Fernández*, 118 D.P.R. 339, 346 (1987); *In re Feliciano Ruiz*, supra, pág. 279 (1986); *Mojica Sandoz v. Bayamón Federal Savs.*, 117 D.P.R. 110, 133 (1986); *Chévere v. Cátala*, supra, pág. 437.

El Art. 18 de la Ley Notarial, 4 L.P.R.A. sec. 2036, le impone al notario el deber de expresar el carácter de las personas que intervienen en el otorgamiento del instrumento público. Dicho artículo dispone lo siguiente:

> [e]l notario expresará la intervención de los otorgantes, haciendo constar si lo hacen en su propio nombre o en representación de otro, salvo cuando la representación emane de la ley, en cuyo caso acreditará la investidura del otorgante, excepto que la misma sea de conocimiento general, en cuyo caso podrá tomar el notario conocimiento de ello, haciéndolo así constar.
>
> El representante suscribirá el documento con su propia firma sin que sea necesario que anteponga el nombre de su representado, ni use la firma o razón de la entidad que represente.

Sobre la acreditación de un representante-compareciente, el Art. 19 de la Ley Notarial, 4 L.P.R.A. sec. 2037, en lo pertinente, ordena que:

> [t]odo otorgante que comparezca en representación de otra persona deberá siempre acreditar ante el notario su designación con los documentos fehacientes, salvo que exista la conformidad expresa de los otorgantes. La eficacia plena de la escritura quedará subordinada a la presentación de prueba documental de la representación alegada.

La Regla 28 del Reglamento Notarial, *supra*, que trata sobre la acreditación de la capacidad representativa voluntaria de un compareciente, además de recoger lo dispuesto por el Art. 19 de la Ley Notarial, *supra*, en su segundo párrafo, según enmienda de 25 de marzo de 1997, expresaba que:

> "[e]l Notario, a su discreción, podrá relacionar en la escritura el documento que le ha sido mostrado y que acredita la capacidad representativa de un compareciente, salvo que deberá relacionar tal referencia en la escritura cuando fuere solicitada por alguno de los comparecientes." (Énfasis omitido.) *In re Emda. Regl. Notarial*, res. el 25 de marzo de 1997, 142 D.P.R. ___ (1997), 97 JTS 37, págs. 800-801.[44]

---

[44] Esta enmienda entró en vigor el 25 de marzo de 1997. Por lo cual, no es de aplicación a las escrituras otorgadas con antelación a dicha enmienda.

Anteriormente, el segundo párrafo de dicha regla recitaba como sigue:

"[e]l notario, a su discreción, copiará en la escritura el documento que le ha sido mostrado y que acredita la capacidad representativa de un compareciente. Cuando fuere solicitado por alguno de los comparecientes, el notario deberá copiar tal **referencia** en la escritura. En todo caso, sin embargo, el notario consignará en la escritura el tipo de documento que se le ha presentado, así como la fecha de tal documento y el nombre del notario autorizante, de existirlo." 4 L.P.R.A. Ap. XXIV R.28. (Énfasis nuestro.)

Por último, dicha regla preceptúa que el notario debe consignar expresamente en la escritura si el representante no acredita su capacidad para otorgar la escritura pública. En dicho supuesto, el notario manifestará que los comparecientes le comunicaron su anuencia para que el instrumento público sea autorizado y para que, posteriormente, se presente prueba fehaciente de tal capacidad. *Íd.* Así también, el notario está obligado a consignar "en la escritura que hizo a todas las partes la advertencia sobre la eficacia en suspenso de la escritura." *Íd.*

Conforme a lo antes expuesto, las enmiendas a la Regla 28 del Reglamento Notarial, *supra*, no afectaron el deber del notario de acreditar las facultades del representante para otorgar el negocio jurídico.[45] No obstante, del 25 de marzo de 1997 al 22 de febrero de 2000, no tenía la obligación de incluir en la escritura referencia alguna del hecho de acreditación, salvo cuando dicha acreditación no se hubiese llevado a cabo. En tal caso, era suficiente consignar expresamente tal hecho, así como que los demás otorgantes dieron su aquiescencia al otorgamiento de la escritura y que la eficacia jurídica de la escritura queda en suspenso hasta tanto se efectúe la acreditación. Sin embargo, la mejor práctica hubiese sido incluir una referencia del documento que acredita la capacidad del representante para otorgar el documento.

Cabe aclarar que para los instrumentos públicos otorgados luego de la vigencia del Reglamento Notarial, después del 1 de agosto de 1995 hasta el 25 de marzo de 1997, era necesario que "el notario consigna[se] en la escritura el tipo de documento que se le ha[bía] presentado, así como la fecha de tal

---

Aunque no es de aplicación a la situación de autos, nótese que el segundo párrafo de esta regla fue enmendado nuevamente el 23 de febrero de 2000. Con tal enmienda, se regresó al lenguaje anterior, aquí citado. No obstante, se cambió la palabra referencia, aquí en negrita, por la palabra documento. Véase, *Enmda. R. 28 Regl. Not. de P.R.*, res. el 23 de febrero de 2000, 2000 TSPR 30, 150 D.P.R. ___ (2000), 2000 JTS 34, págs. 697-698.

[45] Reiteramos que cuando un representante comparece a nombre de una persona jurídica es necesario "legalizar las firmas" en las certificaciones expedidas por los funcionarios del ente acreditando la autoridad del representante para otorgar el negocio jurídico. *Pino Development Corp. v. Registrador*, 133 D.P.R. 373, 383 (1993). Así también, reafirmamos que no es obligatorio el que el representante preste juramento "de sus facultades para efectuar cualquier trámite requerido a nombre de la persona jurídica representada." *Íd.*, pág. 384.

documento y el nombre del notario autorizante, de existirlo." 4 L.P.R.A. Ap. XXIV R.28.[46]

En el caso ante nos, según consta de los informes sometidos por la ODIN, en varias escrituras, el notario no hizo constar expresamente haber acreditado las facultades de los representantes de la casa hipotecaria para otorgar los instrumentos públicos. Sin embargo, si el notario efectivamente acreditó las facultades del representante, no estaba obligado a hacer expresión alguna sobre tal hecho, aunque la nueva enmienda así lo requiera, ya que ésta aun no estaba vigente.[47]

Por otra parte, el notario sólo tenía el deber de hacer mención de la no acreditación. Si realmente no acreditó las facultades del representante, el notario estaba obligado a que le acreditaran tales capacidades y así expresarlo en un documento aparte para que la escritura otorgada anteriormente cobrase eficacia jurídica. Al no tener los elementos de juicio necesarios, no podemos determinar si el notario violó las disposiciones relacionadas con este asunto.

G.    *Falta del segundo apellido de un compareciente*

En relación a la conveniencia de expresar en una escritura pública los dos apellidos de los otorgantes, antes de la aprobación de la actual Ley Notarial, supra, dispusimos lo siguiente:

> [n]o hay duda de que en Puerto Rico existen muchas personas que responden a un mismo nombre y apellido. Ello, como sabemos, debido a que hay apellidos que son muy comunes en nuestra tierra. Nuestro sistema de derecho registral está predicado en la certeza y corrección de sus inscripciones. Los asientos del Registro deben ser lo más completos y claros que sea posible. Ello evita confusión y la comisión de errores. **El expresar el nombre completo y los dos apellidos de los otorgantes en una escritura pública no resulta gravoso ni para éstos ni para el notario autorizante**. (Énfasis nuestro.) Acevedo *v. Registrador*, 115 D.P.R. 461, 462 (1984).[48]

---

[46] La publicación comercial Leyes de Puerto Rico Anotadas, comúnmente conocida como L.P.R.A., no ha incorporado nuestra
resolución de 25 de marzo de 1997, enmendando la Regla 28 del Reglamento Notarial, *supra*. Véase, *In re Emda. Regl. Notarial*, supra. No obstante, dicha enmienda fue dejada sin efecto al enmendarse nuevamente la Regla 28 del Reglamento Notarial, *supra*. Véase, *Enmda. R. 28 Regl. Not. de P.R.*, supra.

[47] Empero entre el 1 de agosto de 1995 y el 25 de marzo de 1997, el notario estaba obligado a consignar ciertas particularidades del documento acreditativo de las facultades.

[48] Esto fue ratificado en *Rosado Collazo v. Registrador*, 118 D.P.R. 577, 585 (1987), y en *Pino Development Corp. v. Registrador*, supra, pág. 388.

Nuestra Ley Notarial, *supra,* en su Art. 15, *supra*, requiere que el notario exprese "[e]l nombre y apellido o apellidos, según fuere el caso...de los otorgantes, ...nombre y circunstancias de los testigos...." Por su parte, la Regla 25 del Reglamento Notarial, *supra*, recoge lo expresado en *Acevedo v. Registrador*, supra, y, en lo pertinente, señala que:

> [e]l notario expresará el nombre completo de los comparecientes. **El mismo comprende los dos apellidos de éstos. Podrá indicar, además, los otros nombres y apellidos por los que fueren conocidos. La comparecencia con el uso de una letra o con un solo apellido será considerado como que constituye el nombre completo del compareciente**. (Énfasis nuestro.)

Es meritorio destacar que debido a la importancia de los nombres en el sistema inmobiliario registral, el Art. 99.4 del Reglamento Hipotecario requiere que los titulares registrales "apare[zcan] de los documentos presentados **con el nombre y todos los apellidos que consten del Registro**." (Énfasis nuestro.) 30 R.P.R. sec. 870.1092(4). A su vez, también requiere que en los asientos "se design[en] los titulares con el nombre y todos los apellidos que aparezcan en los títulos que se presenten, sin que sea permitido al Registrador añadir o quitar ninguno." *Íd*.

Conforme a lo aquí dispuesto, el notario tenía la obligación de expresar el nombre completo –incluyendo el segundo apellido– de cada uno de los otorgantes, siempre que fuese posible, ya que, por lo general, el requerirle el segundo apellido a éstos no es oneroso para ninguna de las partes. Al no hacerlo, el notario violó tanto la Ley Notarial, *supra*, como el Reglamento Notarial, *supra*, y, en los casos de hipotecas, también el Reglamento Hipotecario. Además, dicha actuación demuestra el desprecio para con las sutilezas que conlleva la práctica de la notaría. En los casos en que no se exprese el segundo apellido de un otorgante, el notario debe hacer constar tal circunstancia.

H.  *Falta de dación de fe del conocimiento de los otorgantes o, en su defecto, del uso de medios supletorios*

Como custodio de la fe pública, la función principal de un notario al autorizar un documento es el dar fe de que el documento cumple con las leyes y la jurisprudencia establecida y de que lo expresado allí es legal y verdadero.

Según señaláramos anteriormente, esta dación de fe causa que el documento autorizado esté revestido de una presunción *iuris tantum* de legalidad. *In re Capestany Rodríguez*, supra; *In re Colón Muñoz*, supra, pág. 150; *In re Roldán Figueroa*, supra.

Como corolario, es necesario que el notario se asegure que quienes comparecen son quiénes dicen ser y, así, lo exprese –en esto estriba la importancia de la fe de conocimiento–,[49] de lo contrario "sobran los notarios." *Cintrón Ramos v. Registrador*, supra, pág. 143; *In re Medina Lugo*, 136 D.P.R. 120, 124 (1994); *In re Rodríguez Gerena I*, 132 D.P.R. 693, 697 (1993); *In re Feliciano Crespo*, 132 D.P.R. 69, 71 (1992). Para alcanzar dicho objetivo, en *Sucn. Santos v. Registrador*, supra, pág. 837, expresamos que:

> [e]l mecanismo para lograr [la] correspondencia real y legítima entre persona y firma, es exigiendo la ley la comparecencia y conocimiento por el notario. En otras palabras, la fe de conocimiento persigue evitar la suplantación de las partes en el otorgamiento.[50]

Concerniente al conocimiento de los otorgantes por parte del notario, este último tiene el deber de consignar expresamente en el documento público su conocimiento personal de los otorgantes. Art. 15 de la Ley Notarial, *supra*; Regla 29 del Reglamento Notarial, *supra*. No es necesario que el notario adquiera este conocimiento a través de una relación previa sino que "basta [con] el conocimiento que el notario deriva de su juicio crítico a través de su relación y su observación de los comparecientes en etapas preliminares al otorgamiento." Regla 29 del Reglamento Notarial, *supra*.[51]

Ante lo cual, en ausencia de conocimiento personal, y, sólo ante tal circunstancia, entran en juego los medios supletorios para identificar a los comparecientes. *Cintrón Ramos v. Registrador*, supra, págs. 143, 145; *Ramírez Lebrón v. Registrador*, 131 D.P.R. 76, 89 (1992). En tal supuesto, el notario tiene que dejar expresamente establecido que se aseguró de la identidad de los

---

[49] Véase, *Cintrón Ramos v. Registrador*, supra, págs. 143, 145; *Ramírez Lebrón v.* Registrador, supra, pág. 86.

[50] Véase, *Cintrón Ramos v. Registrador*, supra; *In re Medina Lugo*, supra; *In re Rodríguez Gerena I*, supra; *In re Toro, Jr.*, 131 D.P.R. 824, 828 (1992); *Ramírez Lebrón v. Registrador*, supra, pág. 85.

[51] Cabe señalar que la Regla 29 del Reglamento Notarial, *supra*, recoge la norma expresada desde el 1977, en *In re Cancio Sifre*, 106 D.P.R. 386 (1977).

comparecientes mediante los medios supletorios de identificación. Art. 15(e) de la Ley Notarial, *supra*; Regla 29 del Reglamento Notarial, *supra*. A su vez, el notario también tiene que "ha[cer] constar en la escritura que otorga el método supletorio específico de identidad que utilizó para cerciorarse...." *Ramírez Lebrón v. Registrador*, supra, pág. 90. Véase también, Regla 30 del Reglamento Notarial, *supra*.

El Art. 17 de la Ley Notarial establece los siguientes medios supletorios de identificación, a saber: (1) **la afirmación de un testigo de conocimiento, quién será responsable de la identificación del otorgante, y, a su vez, el notario es responsable de la "identidad del testigo"**;[52] (2) "[l]a identificación de una de las partes contratantes por la otra, siempre que de esta última dé fe de conocimiento el notario"; y, (3) la identificación mediante documentos oficiales con foto y firma –emitidos por Estado Libre Asociado de Puerto Rico, los Estados Unidos, o por uno de los estados de la Unión– "o por pasaporte debidamente expedido por autoridad extranjera." (Énfasis nuestro.) 4 L.P.R.A. sec. 2035. Véase también, Regla 30 del Reglamento Notarial, *supra*.

En síntesis, la fe de conocimiento se consuma a través de los siguientes tres (3) elementos, a saber: "(1) la comparecencia física de cada uno de los otorgantes ante el notario autorizante; (2) que sea en presencia de dicho funcionario que se otorgue el acto notarial; y (3) que el notario conozca a cada uno de los otorgantes, o en su defecto, que se asegure de su identificación mediante la utilización subsidiaria de los medios supletorios que permite el artículo 17 de la Ley Notarial vigente." (Énfasis suprimido.) *Cintrón Ramos v. Registrador*, supra, pág. 143. De esta forma se dificulta "la suplantación de las partes en el otorgamiento" de una escritura pública. (Énfasis

---

[52] "[E]l testigo de conocimiento es aquella persona bien conocida del Notario, y quien acredita en forma íntegra y sin lugar a dudas la identidad del otorgante u otorgantes que no son conocidos del Notario. Es el testigo que establece el eslabón del conocimiento entre el Notario y el otorgante u otorgantes en la situación indicada." Torres Peralta, *op. cit.*, pág. 9.14.

Incluso, el mero conocimiento del testigo de conocimiento por parte del notario no es suficiente sino que aquél tiene que ser conocido "por el notario en aquellas cualidades básicas de solvencia moral." *In re Toro, Jr.*, 131 D.P.R. 824, 828 (1992); *In re Olmo Olmo*, 113 D.P.R. 441, 464 (1982). Véase, Torres Peralta, *op. cit.*, pág. 10.16.

suprimido.) *In re Ramos Vélez*, res. el 1 de junio de 2000, 2000 TSPR 82, 151 D.P.R. ___ (2000), 2000 JTS 94, pág. 1244; *Cintrón Ramos v. Registrador*, supra; *In re Medina Lugo*, supra; *In re Rodríguez Gerena I*, 132 D.P.R. 693, 697 (1993).

Aplicando lo aquí expuesto al caso de autos, el notario violó la Ley Notarial, *supra*, e incurrió en negligencia crasa al no dar fe del conocimiento de los otorgantes, o en su defecto, del uso de medios supletorios. Así también, el notario incumplió con su deber al autorizar documentos públicos en los cuales no conocía al testigo de conocimiento. Además de estar sujetas a severas sanciones, dichas omisiones causan la anulabilidad de dichos documentos. Art. 35 de la Ley Notarial, 4 L.P.R.A. sec. 2053. Véase, *Cintrón Ramos v. Registrador*, supra, pág. 147. Igualmente, el notario violó la Ley Notarial, *supra*, al autorizar escrituras donde comparecía una persona no firmante, como representante de la casa hipotecaria, y aparecía un firmante que no comparece, un representante distinto. Estas últimas podrían ser nulas ya que el Art. 34 de la Ley Notarial, 4 L.P.R.A. sec. 2052, dispone que un documento público es nulo, entre otras cosas, si no aparece la firma de algún compareciente que debió haber firmado.

I.  *Utilización de testigos instrumentales prohibidos*

Un testigo instrumental es aquél "que presencia el acto de lectura, de consentimiento, firma y autorización del instrumento público a requerimiento de las partes o del notario autorizante, o cuando alguno de los otorgantes no sepa o no pueda leer o firmar." Regla 31 del Reglamento Notarial, *supra*. Véase, Art. 20 de la Ley Notarial, 4 L.P.R.A. sec. 2038.

Conforme al Art. 22 de la Ley Notarial, puede ser testigo –en un instrumento notarial– aquél que: (1) sea mayor de edad, (2) tenga capacidad, y (3) sepa y pueda leer y firmar. 4 L.P.R.A. 2040. A renglón seguido, dicho artículo dispone que "[n]o podrán ser testigos instrumentales los empleados del notario autorizante, ni los parientes del notario o de las partes interesadas, dentro del cuarto grado de consanguinidad o segundo de afinidad." *Íd*.

En su informe, la Directora puntualizó que el notario querellado autorizó escrituras empleando testigos instrumentales dentro de las prohibiciones

impuestas por la Ley Notarial, *supra*.[53] Ciertamente, la intervención del notario en el otorgamiento de dichos instrumentos públicos demuestra un pobre conocimiento de los principios básicos del derecho notarial, así como una crasa negligencia e indiferencia de su parte. Es principio harto conocido que la práctica de la notaría requiere de un cuidado extremo. Dicha actuación impropia constituye una falta grave –afecta la eficacia de los documentos, *In re Ramos Vélez*, supra– que conlleva su nulidad. Art. 34 de la Ley Notarial, 4 L.P.R.A. sec. 2052; Regla 33 del Reglamento Notarial, *supra*; *In re Martínez Ramírez*, supra. Este quebrantamiento de la Ley Notarial, *supra*, acarrea severas sanciones.

*J.    Ausencia de dación de fe de unidad de acto*

Íntimamente relacionado con lo anterior, se requiere unidad de acto siempre y cuando comparece un testigo instrumental en el otorgamiento de un instrumento público. Regla 35 del Reglamento Notarial, *supra*. Cuando ello ocurre, el notario, bajo su fe notarial, tiene que hacerlo constar en la escritura. *Íd.*; Art. 24 de la Ley Notarial, 4 L.P.R.A. sec. 2042.

Del informe de la Directora surge que el notario no dio fe de la unidad de acto cuando ello era necesario ya que estaban presentes testigos instrumentales. Dicho proceder claramente transgrede los preceptos impuestos por la Ley Notarial, *supra*.

*K.    Falta del valor de la hipoteca en caso de ejecución*

Reiteradamente, hemos señalado que el precio de tasación acordado por las partes en la escritura de constitución de hipoteca es el precio o tipo mínimo a usarse tanto en el procedimiento sumario de ejecución de hipoteca como en el ordinario. *Rodríguez Morales v. Registrador*, supra, pág. 546; *Arroyo v. Ortiz y Franco*, 133 D.P.R. 62, 69 (1993). Véase, Artículo 221 de la Ley Hipotecaria, 30 L.P.R.A. sec. 2721.[54] Por ello, para poder llevar a cabo "la

---

[53] Las siguientes escrituras son un vivo ejemplo de ello: Escritura Núm. 100 del Protocolo de 1992 (hijos de los otorgantes como testigos instrumentales); Escritura Núm. 172 del Protocolo de 1992; y la Escritura Núm. 572 del Protocolo de 1992.

[54] Véase también, *Junta Retiro Maestros v. Registrador*, 109 D.P.R. 569, 571 (1980); *Ponce Federal Savings v. Gómez*, 108 D.P.R. 585, 590 (1979). Estos casos fueron resueltos bajo la anterior legislación hipotecaria.

ejecución y cobro de un crédito hipotecario" ya sea mediante al procedimiento ordinario o el sumario, "[es] indispensable que en la escritura de constitución de la hipoteca se determine el precio en que los interesados tasen la finca o derecho real hipotecado...." Art. 179 de la Ley Hipotecaria, 30 L.P.R.A. sec. 2575; *Rodríguez Morales v. Registrador*, supra.

Por su parte, el Art. 87 de la Ley Hipotecaria en los casos de constitución de hipoteca, requiere que en la inscripción de dicha hipoteca se exprese, entre otras, el valor asignado en caso de subasta. 30 L.P.R.A. sec. 2308.[55] Ello unido a que la ausencia de mención de dicho valor no cumple con el principio de especialidad que rige el derecho registral inmobiliario,[56] colegimos que es **requisito *sine qua non* para la inscripción de una hipoteca el que notario haga constar en la escritura de constitución el precio de tasación que acuerden las partes.**

En la situación de autos, en la Escritura Núm. 699 del protocolo de 1992, entre otras, el notario no indicó el valor de la propiedad en el caso de ejecución. Dicha omisión constituye una falta grave ya que la hipoteca al no ser inscribible carece de eficacia jurídica. *In re Ramos Vélez*, supra. Lo cual, lo expone a sanciones disciplinarias. Ello porque, aunque hoy dejamos claro que dicho defecto causa la nulidad de una hipoteca, entendemos que de nuestros pronunciamientos anteriores surgía la necesidad de expresar en la escritura

---

[55] Por su parte, el Art. 168.1 del Reglamento Hipotecario, *Ley Hipotecaria y del Registro de la Propiedad y su Reglamento*, *op. cit.*, págs. 404-405, dispone lo siguiente:

<b>continúa...</b>

[55] ...**continuación**

    [l]a tasación de la finca que hagan las partes para propósitos de subasta en caso de ejecución de hipoteca, según lo dispuesto en el Artículo 179 de la Ley [30 L.P.R.A. sec. 2575], se expresará en una cantidad monetaria, sin que baste alguna fórmula o alusión a otras cantidades de las garantizadas con la hipoteca que sean contingentes.

Véase, L.R. Rivera Rivera, *Derecho Registral Inmobiliario Puertorriqueño*, San Juan, Jurídica Editores, 2000, págs. 466-470.

[56] En *Junta Retiro Maestros v. Registrador*, supra, resuelto bajo la anterior legislación, determinamos que una cláusula donde no se dispuso una cantidad específica para el precio de tasación no cumplía con el principio de especialidad que requiere el derecho hipotecario. Dicha cláusula disponía lo siguiente: "[l]as partes, de común acuerdo, tasan la finca hipotecada en la cantidad que resulte adeudarse conforme a sentencia firme, para que dicha cantidad sirva de tipo mínimo en la primera subasta que se celebre...." *Íd.*, pág. 570. Por lo cual, resolvimos que la escritura no era inscribible.

de constitución un tipo mínimo de remate para los casos de subastas. Así también, la Ley Hipotecaria, *supra*, recalca la obligación de ello. Por último, un notario dedicado a cierres hipotecarios debe ser más consciente de que de no expresarse el precio de tasación no puede ejecutarse la hipoteca.

*L.    Falta de firma de los otorgantes y/o testigos*

Otra de las deficiencias recurrentes cometida por el notario es la autorización de escrituras públicas carentes de la firma de los otorgantes y/o testigos.

La firma es un requisito fundamental en una escritura pública ya que demuestra la "aprobación [por parte del firmante] del texto escrito que antecede." Su*cn. Santos v. Registrador*, supra, pág. 837. El Art. 16 de la Ley Notarial dispone que "[l]os otorgantes y los testigos firmarán la escritura y [,] además [,] estamparán las letras iniciales de su nombre y apellido o apellidos al margen de cada una de las hojas del instrumento, las cuales rubricará y sellará el notario." 4 L.P.R.A. sec. 2034. Por lo que, cuando el notario autoriza una escritura sin las firmas de los otorgantes y/o testigos está quebrantando la Ley Notarial, *supra*.[57]

La ausencia de la firma de las partes y testigos acarrea la nulidad del instrumento público. En lo concerniente, el Art. 34 de la Ley Notarial, supra, preceptúa que:

> [s]erán nulos los instrumentos públicos:
> . . .  .   .   .   .   .
> (3)  **En que no aparezcan las firmas de las partes y testigos cuando deban hacerlo, y la firma del notario.** (Énfasis nuestro.)

La omisión de la firma de uno o más de los otorgantes y/o testigos es una falta grave que causa un gran perjuicio a los otorgantes. Éstos quedan defraudados ya que –luego de depositar su confianza en el notario para que éste plasmase sus voluntades y las revistiese con su fe pública– el documento otorgado es nulo. Este tipo de falta es contraproducente ya que engendra una incertidumbre que se supone que no exista luego de acudir ante el notario para

---

[57] En lo pertinente el Art. 28 de la Ley Notarial, 4 L.P.R.A. sec. 2046, expone que "[l]os que suscriban un instrumento público en cualquier concepto, lo harán firmando al final y estampando las iniciales de su nombre y apellido o apellidos

otorgar el instrumento público. Aunque esta falta podría deberse a la inadvertencia de los comparecientes, es el notario quien tiene la responsabilidad de que se observen todas las solemnidades requeridas y de que el documento cumpla con todos los requisitos exigidos por ley. La responsabilidad del notario por la gestión notarial es personal e indelegable. *In re Torres Olmeda*, supra, pág. 959; *In re Vargas Hernández*, supra, pág. 608; *In re Rivera Alvelo y Ortiz Álvarez*, supra, pág. 864. Por lo que, dicha actuación acarrea serias sanciones disciplinarias. *In re Sánchez Quijano*, supra; *In re Colón Muñoz*, supra; *In re Platón*, 113 D.P.R. 273, 274 (1982).

Por razones obvias, en la situación de autos como las escrituras ya fueron otorgadas, las firmas necesarias no podrán ser tomadas dentro del mismo día natural –Art. 28 de la Ley Notarial, *supra*– o en el momento del otorgamiento –de haber comparecido testigos instrumentales.[58] Para corregir la situación es necesario el otorgamiento de una nueva escritura ya que la ausencia de las firmas causa la nulidad formal radical total de la escritura.

*M.    Falta de iniciales de los otorgantes y/o testigos*

Conforme al último informe, la Directora expresó su preocupación de que, a su entender, nuestros pronunciamientos anteriores no han establecido claramente la norma sobre la falta de iniciales –sin estar presente simultáneamente la falta de firmas.[59]

La Ley Notarial, *supra*, requiere que los otorgantes y los testigos estampen sus iniciales en cada una de las páginas del documento. Art. 16 de

---

al margen de todos los folios, en la forma que habitualmente empleen y el notario lo hará a continuación de los mismos, rubricándolo, signándolo y sellándolo."

[58] El Art. 24 de la Ley Notarial, *supra*, dispone que"[c]uando al otorgamiento comparecieren testigos [instrumentales], habrá unidad de acto, lo que bajo su fe notarial hará constar el notario en la escritura."

[59] Véase, entre otros, *In re Moreira Avillán*, res. el 13 de noviembre de 1998, 98 TSPR 152, 147 D.P.R. ___ (1998), 99 JTS 12, pág. 563; *In re Colón Muñoz*, supra, pág. 158; *In re Platón*, supra. Por ejemplo, en *In re Moreira Avillán*, supra, expresamos lo siguiente:

> ...las iniciales, como parte integrante de la firma, son necesarias para la validez de una escritura. La omisión de tomar la firma e iniciales, además de ser una falta notarial grave y una violación a la fe pública de que están investidos los notarios, es causa de nulidad del instrumento público. (Citas omitidas.)

la Ley Notarial, *supra*.[60] Esto es así ya que "[l]as iniciales garantizan el consentimiento de los comparecientes en cada folio de la escritura y protegen contra el fraude." P. Malavet Vega, *Manual de Derecho Notarial Puertorriqueño*, 2da ed., Rep. Dom., Ed. Corripio, 1994, pág. 97.

Sobre el particular, la Profesora Sarah Torres Peralta comenta que:

> "[l]a omisión de las iniciales de los otorgantes en cada uno de los folios de la escritura pública es una **falta notarial grave**. Las iniciales forman parte integrante de la firma, cuya omisión tiene efecto de nulidad absoluta del documento. **La ausencia de iniciales en los folios del instrumento equivale a la ausencia de firma, en cuyo caso, debe derrumbarse el instrumento completo**. (Énfasis nuestro.) S. Torres Peralta, *op. cit.*, pág. 13.11.

De lo antes expresado, podríamos colegir que la falta de iniciales en alguna o más páginas causa la nulidad del documento.

No obstante, **la Regla 45 del Reglamento Notarial, *supra*, deja claro que la falta de iniciales causa la anulabilidad del documento**. Dicha regla estipula que:

> [a]demás de los casos expresados en la ley, serán anulables, sin afectar el negocio jurídico, los instrumentos en que falten:
>
> (A)  [l]as iniciales de uno o más de los comparecientes o las huellas de algún otorgante, en caso de ser necesarias, al margen de uno o más folios o,
>
> (B)  las estampillas correspondientes.

La ausencia de iniciales en uno o más folios del documento —en cuanto sea posible— puede ser corregida mediante una escritura de rectificación. Sin embargo, ello no es eximente para el notario de la correspondiente sanción disciplinaria por haber violado la Ley Notarial, *supra*.

*N.   Falta de la firma del notario*

Diáfanamente, el Art. 34 de la Ley Notarial, *supra*, establece que los documentos en los que no conste la firma del notario son nulos.[61] Sin lugar a dudas, este tipo de defecto sólo es atribuible al notario. El mismo demuestra la falta de diligencia y celo profesional del notario.

---

[60] Véase también, nota al calce núm. 57, *ante*.

[61] Véase, *In re Sánchez Quijano*, supra, pág. 1377; *In re Colón Muñoz*, supra, pág. 161.

En su informe, la Directora destacó que varias escrituras autorizadas por el notario carecían de la firma de éste.[62] A tenor de lo antes expuesto, en la situación ante nos, el notario violó la Ley Notarial, *supra*, al incurrir en dicha falta grave.

*O.   Falta del sello y rúbrica*

De acuerdo al Art. 16 de la Ley Notarial, *supra*, y a la Regla 34 del Reglamento Notarial, *supra*, el notario tiene la obligación de imprimir su sello y estampar su rúbrica en cada de los folios del instrumento autorizado. Incluso, tanto la Ley Notarial, *supra*, como el Reglamento Notarial, *supra*, le imponen al notario el deber de sellar y rubricar cada una de las páginas de la copia certificada.[63] Este tipo de conducta constituye una crasa violación a la Ley Notarial, *supra*.[64]

*P.   Deficiencias en sellos*

De todos los informes de la Directora, el común denominador es la deficiencia en sellos, es decir, el dejar de adherir y cancelar los sellos –tanto de Rentas Internas como el Notarial– al momento de autorizar los documentos.

En lo pertinente, el Art. 10 de la Ley Notarial dispone que:

> [s]erá deber de todo notario adherir y cancelar en cada escritura original que otorgare y en las copias certificadas que de ella se expidieren los correspondientes sellos de Rentas Internas y un sello que el Colegio de Abogados de Puerto Rico adoptará y expedirá por valor de un dólar ($1) cuyo producto de venta ingresará en los fondos de dicho Colegio. 4 L.P.R.A. sec. 2021.[65]

---

[62] Véase, entre otras, las Escrituras Núms. 213, 304, 313, 319, 328, 463, 474, 849, 853-B, 861, 862 del 1992; Escrituras Núms. 88, 98, 100, 327, 401, 402, 403, 404, 406, 424, 427 del 1993; y, Escrituras Núms. 388, 394, 674 del 1994.

[63] En *In re Colón Muñoz*, supra, señalamos que "[e]l dejar de estampar dicho sello arroja dudas sobre la integridad formal del documento y sobre su validez jurídica." Esto es así ya que el imprimir el sello notario robustece la solemnidad externa del documento y dificulta la falsificación del mismo. Torres Peralta, *op. cit.*, pág. 8.48.

[64] Véase, por ejemplo, las siguientes escrituras, entre otras, que carecen de sello y rúbrica en uno (1) o más folios: Núms. 11, 26, 56 del 1990; Núms. 2, 6, 7, 8, 10, 11, 12, 15, 16, 34, 35, 43, 53, 54, 56, 67 del 1992; y, Núms. 3, 4, 6, 7, 11, 13, 14, 15, 16 del 1993.

[65] La Ley 188 de 30 de julio de 1999 añadió al final de ese párrafo la siguiente oración: "Disponiéndose que el Secretario de Hacienda podrá adoptar y expedir electrónicamente, por sí o por medio de agentes de Rentas Internas, un sello de impuesto notarial que servirá el mismo propósito y que se utilizará de la misma forma."

Este deber del notario de adherir y cancelar los sellos es simultáneo al momento de autorizar un instrumento público. *In re Merino Quiñones*, 115 D.P.R. 812, 813-814 (1984). Es doctrina reiterada que, al no actuar de esa forma, el notario incurre en una falta grave, la cual lo expone a serias sanciones disciplinarias. *In re Sánchez Quijano*, supra, pág. 1377; *In re Capestany Rodríguez*, supra, pág. 1339. Incluso, dicha falta podría constituir el delito de apropiación ilegal. *In re Sánchez Quijano*, supra; *In re Juan Capestany Rodríguez*, supra; *In re Colón Muñoz*, supra, pág. 155.

Al mismo tiempo, es importante subrayar que, la omisión de adherir y cancelar los correspondientes sellos deja en entredicho la validez de los instrumentos -incluso, la de las copias certificadas- ya que los mismos son anulables hasta que dichos sellos sean adheridos y cancelados. *In re Capestany Rodríguez*, supra; *In re Colón Muñoz*, supra, pág. 156, *In re Ralat Pérez*, 124 D.P.R. 745, 747 (1989).

No nos convence el argumento del notario de que no adhería los sellos hasta encuadernar los protocolos debido a que, anteriormente, habían desaparecido sellos ya adheridos. Nuevamente, reiteramos que dicha obligación es coetánea al momento de autorizar un documento público. Además, según señaláramos previamente, el notario tiene el deber de custodiar y proteger la integridad de los protocolos.

En el caso ante nos, el notario -en su afán por autorizar un sinnúmero de escrituras- dejó de adherir y cancelar la friolera de **$57,428.00** -sólo en sellos de Rentas Internas, en los protocolos de 1996 y 1997. Para el 1998, el notario no adhirió ni canceló sellos de clase alguna en las escrituras. Por lo cual, la cantidad para dicho año ascendió a la suma de **$78,880.50** en sellos de Rentas Internas y de $972.00 en sellos notariales.

Dicho proceder es muestra de su desdén al cumplimiento de la Ley Notarial, *supra*. Esa actitud también es testimonio del craso desconocimiento del notario

de nuestros pronunciamientos sobre el particular, lo cual lo hace objeto de las más severas sanciones.[66]

En adición, y más preocupante aún, es que la fianza notarial —$15,000.00— la cual responde preferiblemente por los sellos de rentas internas y por los gastos necesarios para proteger el Protocolo del notario, es por lo menos ocho (8) veces menor que la cantidad adeudada en sellos —sólo tomando en consideración el 1996, 1997 y 1998.[67] Véase, Art. 7 de la Ley Notarial, 4 L.P.R.A. sec. 2011. Un notario que deja de adherir sellos por una cantidad mayor a la fianza notarial constituye una amenaza —para el tráfico jurídico de los bienes inmuebles así como para los que habitualmente utilizan sus servicios— al igual que aquel notario que no haya prestado tal fianza. *In re Ribas Dominicci I*, supra, pág. 499.

Q.    *Ausencia de nota de saca*

Cada vez que un notario expide una copia certificada tiene que hacerlo constar mediante una nota —conocida como nota de saca o nota de expedición de copia— al margen de la escritura matriz. En dicha nota debe expresar: (1) el nombre de la persona a favor de quien expidió la copia certificada, (2) la fecha, y (3) el número correspondiente a esa copia tomando en consideración las expedidas. Art. 41 de la Ley Notarial, 4 L.P.R.A. sec. 2063; *In re Colón Muñoz*, supra, págs. 161-162. El notario tiene la obligación de firmar la nota de saca. Regla 51 del Reglamento Notarial, *supra*.

Según el informe de la Directora, un gran número de escrituras carecen de la firma del notario en la nota de saca e, incluso, algunas no tienen nota de saca. Al expedir copias certificadas con rapidez, pero sin tomar las

---

[66] En *In re Nieves Ortiz*, res. el 2 de marzo de 1998, 98 TSPR 17, 144 D.P.R. ___ (1998), 98 JTS 19, pág. 605, señalamos que: "[l]as deficiencias de omitir adherir un total de $2,293.00 en sellos de rentas internas y notariales son **graves**. Implican un manejo sumamente descuidado de la obra notarial y, de ordinario, conllevan fuertes y ejemplarizantes sanciones, tales como la suspensión indefinida de la notaría y/o de la abogacía por determinado período." (Énfasis en el original.)

[67] La finalidad de la fianza notarial es responder por los daños y perjuicios que ocasione un notario en el ejercicio de sus funciones o por el incumplimiento de sus deberes ministeriales. *In re Ribas Dominicci I*, 131 D.P.R. 491, 497 (1992).

precauciones necesarias, el notario claramente incurrió en conducta violatoria a la Ley Notarial, *supra*.

R.    *Nota de saca a favor de un no compareciente*

Conforme a lo anteriormente expresado, al expedir una copia certificada, el notario tiene que hacer constar en la nota de saca, entre otras cosas, el nombre de la persona a favor de quien expidió dicha copia. Art. 41 de la Ley Notarial, *supra.* Respecto a esto último, el ordenamiento notarial delimita las personas con derecho a obtener copia certificada del instrumento público, a saber: (1) los otorgantes; (2) los causahabientes de los otorgantes; (3) los representantes de los otorgantes; (4) "[l]a[s] persona[s] a cuyo favor resulte del documento matriz algún derecho, o por acto distinto a éste..."; (5) aquéllos que le acrediten al notario "tener interés legítimo en el documento para el ejercicio de un derecho, facultad o acción, o para acreditar la celebración del acto contenido en el instrumento"; y, (6) el Registrador de la Propiedad. Regla 47 del Reglamento Notarial, *supra*. Véase, Art. 43 de la Ley Notarial, 4 L.P.R.A. sec. 2065.[68] Por lo que, no es necesario que una persona sea otorgante para que tenga derecho a obtener copia certificada.

En su Informe, la Directora se limitó a señalar que el notario expidió copia certificada a personas no comparecientes. Ello no permite que determinemos si el notario incurrió en violación alguna relacionada con esto.

S.    *Ausencia de nota de apertura y falta de firma y sello en la nota de apertura del protocolo*

El Art. 50 de la Ley Notarial le exige al notario que cada año incluya una nota de apertura del protocolo en el primer folio del primer documento. 4 L.P.R.A. sec. 2074; Regla 54 del Reglamento Notarial, *supra*. La importancia de esta nota estriba en que "[c]on ella se identifica el inciso de un protocolo con especificación de la fecha exacta." *In re Colón Muñoz*, supra, pág. 162.

---

[68] Nótese que la Regla 48 del Reglamento Notarial, *supra*, dispone que "[e]n caso de reconocimiento de hijos, el que tiene interés en la filiación tiene derecho a obtener copia parcial certificada, en vida del testador, de la cláusula del testamento donde es reconocido."

Así también, el notario tiene la obligación de firmar, signar, sellar, rubricar y fechar dicha nota de apertura.[69]

En caso de que el protocolo esté compuesto por más de un (1) tomo, el notario tiene la obligación de incorporar una nota de apertura en cada tomo adicional. Art. 51 de la Ley Notarial, 4 L.P.R.A. sec. 2075. A pesar de no requerirlo explícitamente, interpretando conjuntamente el Art. 50[70] y el Art. 51 de la Ley Notarial, *supra*,[71] colegimos la obligación del notario de firmar, signar, sellar, rubricar y fechar la nota de apertura de cada tomo.

Conforme al Informe de la Directora, las escrituras adolecían de las siguientes faltas, entre otras: (1) ausencia de sello en la nota de apertura del protocolo de 1992, (2) ausencia de la nota de apertura, y (3) notas de apertura de tomo incompletas.[72] Este tipo de falta evidencia la falta de cuidado y celo profesional del notario.

T.  *Ausencia de sello y firma en la nota de cierre de tomos de un protocolo*

---

[69] El Art. 50 de la Ley Notarial, *supra*, reza de la siguiente manera:

> La primera cara del primer documento de cada documento de cada protocolo se rotulará del modo siguiente:
>
> > "Protocolo de instrumentos públicos correspondientes al año (tal)."
>
> Del mismo modo se cerrará cada protocolo en el último día de cada año natural, autorizando el notario la siguiente nota, a continuación de la página final del último instrumento protocolado:
>
> > "Concluye el protocolo del año (tal) que contiene (tantos) instrumentos públicos autorizados por mí, el infrascrito notario, de lo que certifico."
>
> Estas notas, tanto las de apertura como las de cierre del protocolo deberán ser firmadas, signadas, selladas, rubricadas y fechadas por el notario autorizante.

[70] Véase, nota al calce núm. 69, *ante*.

[71] Cabe señalar la norma de hermenéutica de que los diferentes artículos de una disposición deben ser interpretados en conjunto, los unos con los otros, para así evitar resultados incoherentes. *P.R.T.C. v. R. Reg. Tel. de P.R.*, res. el 12 de junio de 2000, 2000 TSPR 83, 151 D.P.R. ___ (2000), 2000 JTS 98, pág. 1267; *Fed. Pesc. Playa Picúas v. J.P.*, res. el 27 de mayo de 1999, 99 TSPR 82, 148 D.P.R. ___ (1999), 99 JTS 87, pág. 1080; *García v. E.L.A.*, res. el 13 de octubre de 1998, 98 TSPR 131, 146 D.P.R. ___ (1998), 98 JTS 133, pág. 147.

[72] Entiéndase por nota de apertura incompleta aquélla que carece de uno o más de los siguientes: (1) sello, (2) firma, (3) signo, (4) rúbrica, y (5) fecha.

Estrechamente relacionado con lo anterior, el Art. 50 de la Ley Notarial, *supra*, establece la responsabilidad del notario de incluir una nota de cierre en la última página del último instrumento del protocolo. Por otra parte, el Art. 51 de la Ley Notarial, *supra*, preceptúa lo mismo, pero en relación a cada tomo del protocolo. Ambas notas también tienen que ser selladas, firmadas, signadas, rubricadas y fechadas.

Aplicando esto a los autos, colegimos que el notario violó la Ley Notarial, *supra*, al no firmar y sellar la notas de cierre de los tomos. Más grave aún, existen tomos donde el notario no incluyó la correspondiente nota de cierre.

*U.   Escrituras con espacios en blanco*

Ciertamente, la Ley Notarial, *supra*, no tolera que se autoricen documentos donde existan espacios en blanco sin inutilizar. Específicamente, el Art. 27 de la Ley Notarial, 4 L.P.R.A. sec. 2045, en lo pertinente, expresa que no "podrán usarse abreviaturas ni dejarse espacios en blanco en el texto...." El dejar espacios en blanco sin inutilizar crea incertidumbre sobre la autenticidad del instrumento público ya que el mismo podría ser alterado. *In re Colón Muñoz*, supra, pág. 165.

De acuerdo a la Directora, el notario en cuestión autorizó varias escrituras donde dejó espacios en blanco sin inutilizar. Sin embargo, nos llama la atención la Escritura Núm. 547 otorgada en 1992. En dicha escritura, el día del otorgamiento está en blanco; en la página 2, aparece el día en blanco y el pagaré también. Contrario a la mejor práctica notarial, este proceder del notario exterioriza su dejadez y abandono hacia esta profesión que, de común y ordinario, exige gran cuidado y diligencia.

*V.   Certificación de hechos falsos*

Al expedir una copia certificada, el notario está obligado a incluir una certificación al respecto. Dicha certificación tiene que expresar, *inter alia*, que en la escritura matriz constan: "(1) [l]as firmas e iniciales de los comparecientes, (2) la firma, rubrica [sic], signo y sello del notario, (3) la cancelación de las estampillas de Rentas Internas y del Impuesto Notarial." Regla 49 del Reglamento Notarial, *supra*. Véase, Art. 39 de la Ley Notarial, 4 L.P.R.A. sec. 2061; *In re Torres Olmeda*, supra.

De los hechos aquí reseñados, surge que, sin lugar a duda, el notario infringió la Ley Notarial, *supra*, y el Reglamento Notarial, *supra*, al expedir copias certificadas de documentos en los cuales la escritura matriz carece de: (1) la firma y/o inicial de algún compareciente, (2) la firma del notario, (3) rúbrica del notario, (4) signo del notario, (5) sello del notario; o, en su defecto, el notario dejó de adherir los sellos de Rentas Internas y del Impuesto Notarial. En múltiples pronunciamientos, hemos advertido "que faltar a la veracidad de los hechos constituye una de las faltas más graves en que pueda incurrir un notario." *In re Díaz Ortiz*, res. el 29 de febrero de 2000, 2000 TSPR 53, 150 D.P.R. ___ (2000), 2000 JTS 66, pág. 929; *In re Vera Vélez*, supra; *In re Iglesias Pérez*, res. el 30 de junio de 1998, 98 TSPR 101, 146 D.P.R. ___ (1998), 98 JTS 108, pág. 41. Esto es así ya que vulnera la fe pública, pilar del Derecho notarial.

Además de ser contraria a la fe pública, dicha actuación constituye una violación al Canon 35 de Ética Profesional, 4 L.P.R.A. Ap. IX, que requiere sinceridad y honestidad por parte de un abogado, incluso en su gestión notarial.[73] Respecto a esto, cabe señalar que no es necesario "que el notario haya faltado a la verdad intencionalmente para faltar a la fe pública y a los Cánones de Ética Profesional." *In re Vera Vélez*, supra; *In re Rivera Alvelo y Ortiz Velázquez*, supra, pág. 863.

Así también del Informe de la Directora, se desprende que el notario autorizó escrituras antedatadas.[74] Es decir, una escritura, en comparación con otra previamente otorgada, tiene fecha anterior a esta última. Ello arroja

---

[73] En lo pertinente, el Canon 35 de Ética Profesional, *supra*, lee como sigue:

> [l]a conducta de cualquier miembro de la profesión legal ante los tribunales, para con sus representados y en las relaciones con sus compañeros debe ser sincera y honrada.
>
> .   .   .   .   .   .   .   .   .
>
> El abogado debe ajustarse a la sinceridad de los hechos al examinar los testigos, al redactar afidávit u otros documentos, y al presentar causas. El destruir evidencia documental o facilitar la desaparición de evidencia testifical en un caso es también altamente reprochable.

[74] Antedata es "fecha falsa de un documento, anterior a la verdadera." *Diccionario de la Lengua Española*, 21ra ed., Madrid, Ed. Espasa Calpe, S.A., 1992, T. I, pág. 150.

dudas sobre la veracidad de la fecha en que tales escrituras fueron otorgadas.[75] Más aún, dicho proceder socava la fe pública notarial y, a su vez, infringe los Cánones de Ética Profesional, *supra*, ya que, al autorizar una escritura, el notario expresa la fecha y hora de otorgamiento del documento e, inclusive, al final del documento del notario certifica sobre el contenido del mismo.[76]

Tales actuaciones del notario demuestran su falta de responsabilidad para con la notaría, así como su afán por autorizar el mayor número de escrituras posible sin tomar las precauciones necesarias que conlleva la gestión notarial. De igual forma, tal comportamiento está reñido con el Canon 38 de Ética Profesional, *supra*, que ordena que el abogado se esfuerce, al máximo, en la exaltación del honor y dignidad de su profesión, aunque ello implique sacrificios personales.

V

La reseña aquí presentada recoge las faltas cometidas por el notario que estimamos más importantes. La voluminosa obra notarial del Lcdo. Armando González Maldonado goza de una diversidad de faltas, desde las más simples hasta las más graves. Todas ellas demuestran la ausencia total de cuidado y celo profesional que requiere la práctica de la notaría. El notario no es un mero instrumento a través del cual se consuma el otorgamiento de un negocio jurídico. El notario tiene el deber de velar porque todo lo autorizado, bajo su mano revestida por la fe pública, cumpla con lo requerido por la ley. Ello cobra más importancia cuando el negocio autorizado trasciende más allá de los otorgantes.

---

[75] Por ejemplo, la Escritura Núm. 515 del protocolo de 1992 tiene fecha junio, mientras que la anterior tiene fecha de agosto; la Escritura Núm 583 del protocolo del 1993 aparece fechada el 9 de julio, sin embargo, las anteriores tienen fecha del 10 de julio. El notario incurrió en esta falta en varias ocasiones.

[76] En lo pertinente, el Art. 26 de la Ley Notarial preceptúa que la certificación del contenido del escrito por parte del notario, al final del mismo, aplica "a todas las palabras, estipulaciones, manifestaciones y condiciones reales o personales contenidas en el instrumento con arreglo a las leyes." 4 L.P.R.A. sec. 2044.

Las actuaciones u omisiones del notario claramente atentaron contra el Canon 18 de Ética Profesional, *supra*.[77] Dichas actuaciones demuestran que el notario, en su afán por autorizar el mayor número de escrituras posible, olvidó la rigurosidad que implica la práctica notarial. Al actuar así, asumió responsabilidades sin tomar en cuenta que no podía rendir una labor competente, lo cual causó que varios de los documentos autorizados no tengan o esté en suspenso su eficacia jurídica. Ello causando demoras e gastos irrazonables a los otorgantes. Es decir, al actuar con gran precipitación y desdén, dejó a un lado el cuidado y esmero que conllevan la gestión notarial. Sin embargo, el actuar con la premura necesaria no debe implicar una correlativa disminución en el celo requerido por la gestión notarial.

Es meritorio destacar que contrario a lo señalado por el notario, las faltas cometidas son más que suficientes para que este Tribunal lo sancione disciplinariamente. Su conducta evidencia un craso desconocimiento de la Ley Notarial, *supra*,[78] del Reglamento Notarial, *supra*,[79] y de nuestros pronunciamientos anteriores.[80]

Por otra parte, no nos convence el argumento del notario referente a que una obra notarial no inspeccionada en un plazo de cinco (5) años tiene que ser corregida en un tiempo corto. Reiteramos que "[l]a tardanza en la inspección de los protocolos no es excusa para una obra notarial deficiente." *In re Madera*

---

[77] En lo referente a la situación en cuestión, el Canon 18 de Ética Profesional, *supra*, preceptúa lo siguiente:

> [s]erá impropio de un abogado asumir una representación profesional cuando está consciente de que no puede rendir una labor idónea competente y que no puede prepararse adecuadamente sin que ello apareje gastos o demoras irrazonables a su cliente o a la administración de la justicia.

[78] El Art. 3 de la Ley Notarial, 4 L.P.R.A. sec. 2003, reza:

> [e]l notario estará autorizado para ejercer su función en todo el Estado Libre Asociado de Puerto Rico. En tal función disfrutará en plena autonomía e independencia, la ejercerá con imparcialidad y estará **bajo la dirección administrativa del Tribunal Supremo de Puerto rico, por conducto de la Oficina de Inspección de Notarías....**" (Énfasis nuestro.)

[79] En lo pertinente, la Regla 4 del Reglamento Notarial, *supra*, dispone que "[e]l notario disfruta de plena autonomía e independencia en su función, **sujeto solamente en organización jerárquica al Tribunal Supremo de Puerto Rico.**" (Énfasis nuestro.)

*Acosta*, res. el 4 de febrero de 1998, 98 TSPR 14, 144 D.P.R. ___ (1998), 98 JTS 14, pág. 574; *In re Colón Muñoz*, supra, pág. 150. *"El notario no puede esperar a que se le inspeccione su protocolo para dar cumplimiento a la ley que regula su ministerio. El notario tiene que cumplir la ley en cada acto en que actúa como tal."* (Bastardillas en el original.) *In re Colón Muñoz*, supra, pág. 151.

Por último, si bien muchas de las faltas cometidas fueron corregidas, lo cual constituye un atenuante a la sanción a imponerse, la gravedad y el carácter repetitivo de muchas de ellas –contrario a la naturaleza simple atribuida por el notario–, el tiempo transcurrido, la insuficiencia de la fianza notarial y la falta de justificaciones válidas, si alguna, requieren la más severa sanción. No estamos ante un notario que recientemente inició o reinició su práctica notarial, sino ante un notario que por años se ha dedicado mayormente al ejercicio de ella, mas grave aún, ante un notario cuya práctica principalmente consiste de cierres hipotecarios. Por ello, *procede decretar la separación inmediata y permanente del notario del ejercicio de la notaría, y la separación inmediata por tres (3) meses del ejercicio de la abogacía.*

En vista de ello, el notario González Maldonado notificará a sus clientes que por motivo de la suspensión no puede continuar con su representación legal y devolverá a éstos los expedientes de los casos pendientes y los honorarios recibidos por trabajos no realizados. Asimismo, informará de su suspensión a cualquier Sala del Tribunal General de Justicia o a cualquier foro administrativo donde tenga algún caso pendiente. Por último, tiene la obligación de acreditar y certificar ante este Tribunal que cumplió con lo antes señalado.

Se dictará sentencia de conformidad.

---

[80] Véase, por ejemplo, *In re Colón Muñoz*, supra.

EN EL TRIBUNAL SUPREMO DE PUERTO RICO

In re

 Armando E. González Maldonado             TS-5643

SENTENCIA

San Juan, Puerto Rico, a 20 de diciembre de 2000.

        Por los fundamentos expuestos en la Opinión *Per Curiam* que antecede, la cual se hace formar parte integrante de la presente, se decreta la separación inmediata y permanente de Armando E. González Maldonado del ejercicio de la notaría. Además, se le separa inmediatamente del ejercicio de la abogacía por un término de tres (3) meses, y hasta tanto solicite reinstalación y así lo disponga este Tribunal.

        El señor González Maldonado notificará a sus clientes que por motivo de la suspensión de la abogacía no puede continuar con su representación legal y devolverá a éstos los expedientes de los casos pendientes y los honorarios recibidos por trabajos no realizados. Asimismo, informará de su suspensión a cualquier Sala del Tribunal General de Justicia o a cualquier foro administrativo donde tenga algún caso pendiente. Por último, tiene la obligación de acreditar y certificar ante este Tribunal que cumplió con lo antes señalado.

El alguacil de este Tribunal se incautará inmediatamente del sello notarial, así como de la parte restante de su obra notarial para el trámite correspondiente por la Directora de la Oficina de Inspección de Notarías.

Lo acordó el Tribunal y certifica la Secretaria del Tribunal Supremo. El Juez Presidente señor Andréu García no intervino.


Isabel Llompart Zeno
Secretaria del Tribunal Supremo